**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| SARA SHANNON and ROSA PALACIOS and DEBRA CORBELLO, Individually and on behalf of all others similarly situated, | Civil Action No. 1:20cv448 |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | **Complaint-Class Action** |
| THE ALLSTATE CORPORATION, | Related Case No. 1:17cv88-LY |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Sara Shannon, Rosa Palacios, and Debra Corbello ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant The Allstate Corporation ("Allstate" or "Defendant"). Plaintiffs' allegations are based upon personal knowledge, the investigation of counsel, and information and belief.

## I.      **INTRODUCTION**

1.      Plaintiffs bring this case against Allstate individually and as a class action on behalf of millions of other similarly-situated Allstate Texas personal auto insurance policyholders who have been harmed by Allstate's illegal and intentionally discriminatory conduct described below.

2.      Allstate has knowingly betrayed the loyalties of millions of its long-time Texas auto policyholders through its implementation of two related discriminatory schemes, both of which involve Allstate charging higher premiums to its more tenured policyholders than it charges otherwise identically-situated newer policyholders for the same or materially the same coverages. As Allstate is well aware, its conduct lacks any actuarial basis (indeed, it defies basic actuarial principles).

3.      Under the first scheme, Allstate takes multiple deliberate steps to "wall off" existing Allstate Texas auto customers in "closed" Allstate Texas insurance "books," precluding them from moving to "open" Allstate Texas books where newer customers pay generally lower premiums for materially the same coverages.  Allstate's "open/closed" scheme, first implemented by Allstate in Texas several years ago, was later emulated by one of Allstate's chief competitors, Farmers Insurance.  Farmers' own implementation of the scheme was the subject of a recently-settled class action case filed in this District, *Grigson et al. v. Farmers Group, Inc.*, W.D. Tex. Civil Action No. 1:17-cv-00088-LY.

4.      In furtherance of this first unfair discriminatory practice, Allstate takes numerous affirmative steps to keep policyholders who are in the "closed" books from switching to the "open"

books. These steps include, *inter alia*, imposing strict internal caps and/or other limitations on closed>open book "re-writes" (i.e., switches), concealing the existence of, and otherwise precluding, existing customers through various means from accessing, the "open" books and their lower premiums.  Among other things, Allstate threatens and intimidates Allstate Texas agents to keep them from switching their "closed" book clients or even telling such clients about the "open" books and associated lower premiums for materially the same coverages, including by threatening the agents with financial punishment and even agency termination.

5.      In nearly all cases, the premium that an existing policyholder pays in the "closed" books is higher (often, very significantly so, as demonstrated by Plaintiff Corbello herself) than the premium an otherwise identically-situated new customer would pay in the "open" books for materially the same coverage.  In some cases, individuals and/or families may save more than $1,000 for every six (6) month policy period if they could switch to the "open" books.   Through this first unfair discriminatory practice, Allstate is forcing its most loyal "closed" book Texas policyholders to unwittingly subsidize the lower "open" book rates from which they are precluded.

6.      Allstate's second scheme occurs within one of the two Allstate Texas "open" books, Allstate Fire and Casualty Insurance Company ("Allstate F&C").  Pursuant to this scheme, Allstate unilaterally places many Allstate F&C Texas policyholders on what a recent *Consumer Reports* investigative report referred to as a "suckers list."[1] Allstate charges those policyholders on the "suckers list" higher auto insurance premiums, for materially the same policies and same coverages, than the premiums charged to otherwise identically-situated Allstate F&C Texas

---

[1]  *See*  https://www.consumerreports.org/media-room/press-releases/2020/02/investigation-finds-allstates-secret-algorithm-resulted-in-sucke/  (last accessed April 28, 2020); *see also* https://themarkup.org/allstates-algorithm/2020/02/25/car-insurance-suckers-list  (published Feb. 25, 2020) (last accessed April 28, 2020).

policyholders, based on Allstate's secret, purely internal projection of whether and how much premium each policyholder is willing to tolerate being charged and still remain an Allstate customer.

7.     Allstate implements this second unfair discriminatory practice by unilaterally assigning each Allstate F&C Texas auto policyholder into one of approximately **922 million** Allstate-coined "microsegments," which assignments are made exclusively by Allstate itself based on Allstate's internal projection of each policyholder's tolerance (or "inelasticity") to premium changes, which projections, in turn, Allstate makes using secret algorithm(s) designed by Allstate and based on secret data.

8.     After assigning each such Allstate F&C policyholder into a microsegment by this method, Allstate then applies a microsegment-specific "Complimentary Group Rating" ("CGR") factor to each microsegment.[2]  The CGR factor, in turn, acts as a "multiplier" that modifies—as a last step in the premium calculation process—the premium that would otherwise apply to the policyholder under the other factors used in calculating the premium (i.e., a positive CGR factor causes the premium that is charged to that policyholder to increase).

9.     Thus, otherwise identically-situated Allstate F&C Texas policyholders who would otherwise be charged the same premiums, are charged different premiums for the same coverages based purely on Allstate's internal projection of their respective elasticity or inelasticity to premium changes.  Allstate F&C Texas policyholders whom Allstate assigns to a microsegment with a positive CGR factor, by definition, pay higher premiums than otherwise-identically situated

---

[2] The CGR factor is alternatively referred to by Allstate as a "Table Assignment Number" ("TAN"). They will collectively be referred to as "CGR" in this Complaint.

Allstate F&C Texas policyholders whom Allstate assigns to a microsegment with a lower, neutral (i.e., 1.0), or negative (<1.0) CGR factor.

10.     The term "microsegment" is a deliberate misnomer. Allstate's use of nearly 922 million microsegments in Texas results in nearly every Allstate F&C Texas policyholder, if not every single one of them, being assigned to their very own microsegment as determined by Allstate's internal projection of that policyholder's "inelasticity" (or tolerance) to premium changes, as described herein.

11.     The assignment of the policyholders to the microsegments, and thus the determination of which CGR factor and, ultimately, which of the essentially infinite number of potential premiums will be charged to each policyholder, is made by Allstate itself, purely as a matter of internal policy and practice (i.e., the secret algorithm(s)) and is not discernible by policyholders or any members of the public. Allstate does not disclose anywhere the methodology or data sources it uses for the microsegment placement, and there is no way for any policyholder or any other member of the public to figure out what their microsegment (or their CGR factor) is, would be, will be, or why or how they were assigned to a particular microsegment.

12.     The effect of this second unfair discriminatory practice on a policyholder's premium can be drastic.  Allstate's microsegment assignment (and thus the CGR that is applied) can increase an individual policyholder's premium by *up to 850%* or decrease it by up to around 90%. This results in drastically different premiums being charged, for the same policies and coverages, to Allstate F&C policyholders whom Allstate's secret algorithm(s) project as having different sensitivities to premium changes but who are otherwise identically-situated and who are exactly the same from a risk perspective.  Those who are charged more end up unwittingly subsidizing those who are charged less for the same insurance coverages.  On information and

belief, most Allstate F&C Texas policyholders are assigned by Allstate to a microsegment with a positive CGR factor, and the magnitude of premium increases applied to those policyholders significantly exceeds the decreases to premiums applied to the minority of policyholders who are assigned to microsegments with negative CGR factors.

13.     In addition to being disturbingly cynical, unethical, and unfair, Allstate's conduct alleged herein (both schemes) directly violates Texas Insurance Code § 544.052, which prohibits persons who do business in Texas from engaging in practices which result in differential treatment (including for rates or premiums) between Texas insurance customers without a sound actuarial basis.  Allstate's discriminatory conduct alleged herein lacks any actuarial basis (indeed, it defies basic actuarial principles).

14.     As a result of Allstate's violations of Texas Insurance Code § 544.052, Plaintiffs and the members of the proposed Classes (defined below) incurred economic damages in an amount to be proven at trial.  Pursuant to Texas Insurance Code § 544.054, on behalf of themselves and the proposed Classes, Plaintiffs by this action seeks damages, court costs and expert witness fees, attorneys' fees, a permanent injunction to stop Allstate from engaging in the alleged discriminatory conduct, which conduct is ongoing, and other relief enumerated below.  Moreover, because Allstate's violations of Section 544.052, alleged herein, have at all times been knowing, intentional, and willful, Plaintiffs, on behalf of themselves and the proposed Classes, further seek Civil Penalties of up to $25,000 for each class member claimant.   Texas Insurance Code § 544.054(e).

## II.     PARTIES

15.     Plaintiff Sara Shannon is a resident of Hays County, Texas, and is an Allstate Texas auto insurance policyholder.  At all material times, she had auto insurance that was created and underwritten by Allstate, sold to her through Allstate agents managed, supervised, and controlled

by Allstate, and most recently provided through Allstate F&C. The address on Plaintiff Shannon's auto policy is in Buda, Hays County, Texas.

16.     Plaintiff Rosa Palacios is a resident of Hays County, Texas, and is an Allstate Texas auto insurance policyholder.  At all material times, she had auto insurance that was created and underwritten by Allstate, sold to her through Allstate agents managed, supervised, and controlled by Allstate, and most recently provided through Allstate F&C. The address on Plaintiff Palacios's auto policy is Buda, Hays County, Texas.

17.     Plaintiff Debra Corbello is a resident of Ellis County, Texas, and is a former Allstate Texas auto insurance policyholder.  She had auto insurance that was created and underwritten by Allstate, sold to her through Allstate agents managed, supervised, and controlled by Allstate, and most recently provided through Allstate Indemnity Company until on or about March 15, 2020, when she switched carriers. The address of Plaintiff Corbello's auto policy was in Red Oak, Ellis County, Texas.

18.     Defendant Allstate Corporation ("Allstate") is a Delaware corporation that maintains its principal place of business at 2775 Sanders Road, Northbrook, Illinois 60062. Allstate may be served through its Registered Agent in Texas: NL Laramore, 2714 Louisiana Street, Houston, Texas.

19.     Allstate is authorized by the Texas Secretary of State to do business in the State of Texas as a foreign corporation. Allstate operates in Texas in the business of insurance, but is not authorized by the Texas Department of Insurance ("TDI") as a licensed insurer.

20.     Allstate maintains exclusive authority and control over virtually all aspects of Allstate Texas auto insurance business done through various insuring entities that are insurers duly licensed by TDI: Allstate F&C, Allstate Indemnity Company, and the Allstate County Mutual

Insurance Company (collectively referred to herein as the "Allstate Texas Insuring Entities"). This business of insurance includes, but is not limited to, "product design" (i.e., the creation and implementation of insurance policy types and policy regimes); actuarial and underwriting services; and controlling the Allstate Texas agents who sell Allstate Texas auto insurance policies throughout the State. Allstate controls and directs the conduct of the officers and directors of the Allstate Texas Insuring Entities.

21.    Allstate was and is responsible for, *inter alia*, designing and directing the implementation of the Allstate Texas auto insurance policies (including the policies of Plaintiffs and the proposed Classes); performing underwriting functions and actuarial services with respect to the Allstate Texas auto insurance policies at issue in this Complaint; and designing, developing, directing, and implementing the unfair discriminatory practices (including, *inter alia*, the policy and conduct in furtherance of "walling off" existing "closed" book customers; the secret algorithm(s) used in the second scheme alleged herein; and assigning Allstate F&C policyholders into the  microsegments) and all other misconduct alleged in this Complaint.

## III.    JURISDICTION AND VENUE

22.    This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) at least one member of the proposed Classes is a citizen of a state different from that of Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed Classes each consist of more than 100 class members, and (d) none of the exceptions under the subsection apply to this action.

23.    This Court has personal jurisdiction over Allstate because Allstate is registered to do business in Texas, has sufficient minimum contacts in Texas, and otherwise intentionally avails itself of the markets within Texas through its business activities, such that the exercise of jurisdiction by this Court is proper and necessary. Moreover, the claims of Plaintiffs and all of the

class members in this case, who are current or former Allstate Texas policyholders subjected to Allstate conduct alleged herein, arise out of and directly relate to Allstate's contacts with Texas.

24.     Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiffs Sara Shannon and Rosa Palacios reside in this District, Allstate conducts substantial business in this District, and a substantial part of the events giving rise to Plaintiffs' and the class members' claims occurred in this District. Further, Section 544.054 of the Texas Insurance Code provides that violations of Section 544.052 must be filed in a district court located in Travis County, Texas. This Court is a district court located in Travis County.

## IV.     FACTUAL ALLEGATIONS

### A.     Allstate is a Major Auto Insurance Provider in Texas and Auto Insurance is a Significant Household Cost.

25.     According to statistics maintained by the TDI, current as of 2017, the Allstate Texas Insuring Entities collectively provide insurance for nearly two million automobiles in the State of Texas, accounting for approximately 10.48% of the Texas auto insurance market.  All told, Allstate is the second-largest personal auto insurer in the State of Texas. Allstate collected approximately $2.218 billion in personal auto premiums in Texas in 2017 alone. At all times relevant herein, the Allstate Texas Insuring Entities have been, and are, controlled by the Defendant.

26.     Auto insurance is the main form of driver responsibility legally required of Texas drivers, and is a significant expenditure for individuals and families. For many insureds/families, auto insurance premiums represent a significant percentage of annual household income.

### B.     Allstate's Unfairly Discriminatory "Open/closed" Scheme

27.     Allstate maintains multiple Allstate Texas auto insurance "companies" (or "books" of business) through which Allstate issues auto policies to policyholders in Texas.  Each auto policy, for each policyholder, is issued through one of these "companies" and part of one of these

"books."   Allstate, in turn, uses the existence of these multiple books to carry out its discriminatory"open/closed" scheme.

28.     Currently, and for the past several years, Allstate has maintained in Texas certain "open" auto insurance books, and certain "closed" auto insurance books:

a.     The "open" books are:   Allstate Fire & Casualty Insurance Company ("Allstate F&C") and Allstate County Mutual Insurance Company—Access ("Allstate CM Access") (together, the "Open Books").

b.     The "closed" auto insurance books include: Allstate Indemnity Company ("AIC") and Allstate County Mutual Insurance Company-Classic ("Allstate CM Classic") (collectively, the "Closed Books").

29.     Allstate's Open Books are open to new Allstate Texas customers (i.e., new customers can have auto policies written through these "companies").

30.     Allstate's Closed Books are not available to new Allstate Texas customers.  Instead, the Closed Books' rosters consist entirely of Allstate Texas policyholders who were existing customers in those books at the time the book was "closed."[3]  Since these books were closed, the only policies written by Allstate in the Closed Books are renewed policies for existing customers in those books.

31.     Allstate Texas auto policies are generally six (6) months in duration. With millions of Allstate Texas insured vehicles in the State, several thousand existing Allstate Texas policies, on average, are subject to policy renewal every day.

---

[3] The Closed Books were each closed to new business on particular dates, years ago.

32.     The following chart prepared by counsel, using publicly available information, shows the approximate gross written premium collected by Allstate in the Closed Books and Open Books from 2010-2019:

33.     The premiums that Allstate charges new policyholders in the Open Books are generally significantly lower (often, very significantly so) than the premiums Allstate charges existing policyholders in the Closed Books for the same or materially the same coverages.

34.     For example, in a phone call between Plaintiff Corbello and an Allstate agent that occurred on or about April 16, 2020, the agent acknowledged that the "newer companies [i.e., Open Books] are cheaper" for nearly all Allstate Texas Closed Book policyholders. The agent further related to Plaintiff Corbello that the "open-closed" strategy was "legal mumbo jumbo" and simply a "way[] [for Allstate] to beat [competitors'] prices" to attract new customers while not offering those same lower rates to existing customers walled off in the Closed Books.

35.     As a matter of internal company policy, Allstate has implemented a multi-faceted scheme that deliberately results in existing Allstate Texas Closed Book policyholders paying higher premiums than otherwise identically-situated (including from a risk perspective) new Allstate Texas policyholders pay in the Open Books for the same or virtually identical coverages. As a matter of internal company policy, Allstate systematically discriminates against existing policyholders in the Closed Books, precluding them from the lower rates provided to new customers in the Open Books.

36.     Even though Allstate policyholders in the Closed Books are eligible for the Open Books, Allstate has set purely *internal* restrictions that preclude Closed Book customers or the vast majority of them from accessing the cheaper Open Book policies with materially similar

coverages. Upon information and belief, these internal restrictions were never disclosed to or filed with the TDI.

37.     Among other things, Allstate instructs Allstate personnel and Allstate Texas agents to categorically conceal and direct the concealment of the lower Open Book rates only from existing Closed Book policyholders, and to otherwise categorically preclude and/or delay existing Closed Book policyholders from attaining the lower Open Book rates available to new customers.

38.     Allstate also threatens Allstate Texas agents with financial punishment and even agency termination to prevent deviation from the discriminatory policy and practice.

39.     On information and belief, as a matter of internal company policy, Allstate sets and enforces strict caps and/or other restrictions on "re-writing" (i.e., switching) Closed Book policyholders to the Open Books.

40.     Allstate trains and instructs Allstate Texas agents not to switch existing Closed Book customers to the Open Books, or even to tell them about the Open Book and its lower available rates except in very rare circumstances.

41.     To ensure that Allstate Texas agents stay in line, Allstate takes aggressive measures to threaten and intimidate the agents to ensure they do not deviate from the playbook.  Among other things, Allstate threatens and has carried out the termination of Allstate agencies (which Allstate can generally terminate at will) if agents deviate from the policy. Termination of an agency can be financially devastating to Allstate Texas agents, not just because it affects their income going forward, but also because Allstate requires agents to invest heavily (the agents' own money) in their agencies despite Allstate retaining the ability to unilaterally terminate the agency.

42.     Allstate also has deliberately designed its agent compensation structure to harshly penalize agents for rewriting Closed Book customers to the Open Book.  Allstate measures agent

performance (for both potential termination of agencies and determining agent bonuses) based on several factors that are negatively impacted by closed>open book rewrites. Allstate deliberately concocted these agent performance metrics as disincentive "tools" to deter agents from rewriting their Closed Book clients to the Open Books.

43.     Allstate measures the so-called "retention" characteristics of the agents' portfolios. Retention measures the number of policyholders in an agent's book of business who renew each policy cycle.  Even though a rewrite of a Closed Book customer to an Allstate Texas Open Book would result in the customer remaining an Allstate Texas policyholder, Allstate's retention model treats that as a non-renewed policy and an agent's retention score thus suffers, exposing the agent to potential termination and/or lessened compensation.

44.     Allstate also tracks the profitability of agents' books of business.  A rewrite to a policy with materially the same coverages for less premium necessarily decreases the profitability of the agent's book of business. Accordingly, moving a substantial number of Closed Book policyholders to the Open Books (and their lower premiums for materially the same coverages) negatively impacts the agent's profitability rating and exposes the agent to potential termination and/or lessened compensation.

45.     Through this "open/closed" scheme, Allstate, by design, successfully walls off the vast majority of its existing Allstate Texas Closed Book customers in the Closed Books, precluding them from accessing the lower rates that otherwise would be available to them, and that are being charged to other customers, in the Open Books.

46.     At the same time it walled off existing Closed Book customers in the Closed Books, Allstate has significantly raised premium rates in those Closed Books over the past several years.

47.     On information and belief, Allstate Texas policyholders in the Closed Books would otherwise be eligible (i.e., under policy eligibility requirements) for the Open Books, but for Allstate's discriminatory policy and conduct alleged herein.

48.     The insurance coverages under the Closed Book policies are the same or materially the same as those under the Open Book policies.

49.     There is no actuarial basis for Allstate's "open/closed" discrimination scheme.  In fact, this discriminatory practice contravenes basic actuarial principles.  It is well accepted in the insurance industry, and as a basic principle of actuarial science, that longer tenured insurance policyholders generally have a more favorable loss experience (i.e., lower losses, lower risk) than less tenured policyholders, and that new customers generally have the worst loss experience of all.

50.     Upon investigation and belief, Allstate itself has conducted studies of the risk profiles of its own customers based on tenure. Those studies and their results are consistent with and confirm the actuarial principle that existing business has a more favorable loss experience new business.

51.     And yet under Allstate's "open/closed" scheme, long standing existing Closed Book policyholders are charged more than otherwise identically-situated new policyholders for the same or material the same coverages without actuarial basis and contrary to actuarial principles.

52.     Plaintiffs are not challenging any of the Closed Book filed rates or rating factors as being unreasonable or excessive, but rather are challenging Allstate's internal unfair discriminatory conduct as alleged herein.

53.     As alleged below, Plaintiff Corbello is one of the many Allstate Texas Closed Book customers who have been harmed by Allstate's discriminatory "open/closed" practice.

**C.    Allstate's Unfairly Discriminatory "Price Tolerance" Scheme.**

54.    Allstate also implements another discriminatory policy and practice, this one involving discrimination between policyholders within one of Allstate's Open Books in Texas, Allstate F&C.

55.    As the "tenure" of certain Allstate F&C policyholders increased (i.e., as they remained in the Allstate F&C book), Allstate implemented a way to unfairly discriminate against those tenured policyholders compared to newer policyholders also in the Allstate F&C book.

56.    Since at least on or about June 26, 2014, and continuing to this day, Allstate has carried out a practice of intentional, differential and unfairly discriminatory treatment among its Allstate F&C Texas auto policyholders.  In order to squeeze as much money (i.e., premium) out of its policyholders as possible, Allstate unilaterally assigns each Allstate F&C Texas policyholder into one of approximately 922 million Allstate "microsegments" (a deliberately misleading term created by Allstate).

57.    Such assignments are determined exclusively by Allstate and are based on Allstate's internal application of a secret algorithm(s) designed by Allstate using secret data to project each policyholder's relative "elasticity" or "inelasticity" to premium price changes.

58.    Under this discriminatory conduct, by its very design, those Allstate F&C Texas policyholders whom Allstate projects are relatively "inelastic" (i.e., less sensitive) to premium price changes are charged higher premiums than otherwise identically-situated (including from a risk perspective) Allstate F&C Texas customers whom Allstate projects are relatively "elastic" (i.e., more sensitive) to premium price changes.

59.    Each of the microsegments carries with it a microsegment-specific "CGR factor" that in essence acts as a premium "multiplier," increasing (positive CGR) or decreasing (negative CGR) the premium that would otherwise apply to the policyholder (i.e., before the application of

the CGR factor).  The CGR factor is applied as the last step in the process of calculating the policyholder's premium.

60.     The effect of Allstate's conduct on a policyholder's premium can be drastic. Allstate's microsegment assignment (and thus the CGR that is applied) can increase an individual Allstate F&C Texas policyholder's premium by ***up to 850%*** or decrease it by up to around 90%, thus resulting in drastically different premiums being charged, for the same policies and coverages, to Allstate F&C Texas policyholders whom Allstate's secret algorithm(s) project as having different sensitivities to premium changes but who are otherwise identically-situated and who are exactly the same from a risk perspective.

61.     On information and belief, and investigation of counsel, Allstate assigns most Allstate F&C Texas policyholders to microsegments with positive CGR factors, while a minority are assigned to microsegments with negative CGR factors, and the average magnitude of the premium increases (positive CGRs) significantly exceeds the average magnitude of the premium decreases (negative CGRs).

62.     The secret algorithm(s) that Allstate uses to make the microsegment assignments is ***not*** risk-based.  It is not based on the expected risk and losses for the policyholder.  Rather, it uses factors (including the policyholder's tenure with Allstate) to project the policyholder's elasticity or sensitivity to premium price changes.  Policyholders with greater tenure with Allstate are generally viewed and projected by Allstate to be less elastic (i.e., less sensitive) to premium price changes, and thus under Allstate's discriminatory conduct, all else being equal, they are generally charged higher premiums for the same policies and coverages than otherwise identically situated customers with less tenure.

63.     Allstate's discriminatory conduct alleged herein disproportionately harms longer-tenured Allstate F&C Texas customers. For example, *Consumer Reports* found, in analyzing data regarding Allstate's similar conduct in other states, that "[m]iddle-aged drivers were overwhelmingly given larger increases."

64.     Allstate's differential treatment and conduct alleged herein lacks any actuarial basis.  In fact, it defies basic actuarial principles.  It is well accepted in the insurance industry, and as a basic principle of actuarial science, that longer tenured insurance policyholders generally have a more favorable loss experience (i.e., lower losses, lower risk) than less tenured policyholders, and that new customers generally have the worst loss experience of all.  Moreover, as alleged above, Allstate has conducted its own internal studies that confirmed this basic actuarial principle.

65.     And yet Allstate's differential treatment and assignment of policyholders into microsegments ***penalizes*** a policyholder's longer tenure with the company, using that policyholder's tenure and loyalty as one of the major factors, if not the primary factor, in determining which policyholders to include on what *Consumer Reports* characterized as its "suckers list."

66.     Allstate's microsegment assignments are not risk-based.  In essence, by its discriminatory practice alleged herein, Allstate is not evaluating insurance risk; rather, it is evaluating price elasticity to identify those Allstate F&C Texas policyholders it can exploit (i.e., the "suckers"), to charge those policyholders more than otherwise identically-situated Allstate F&C Texas policyholders for the same coverages, and in fact to charge the "suckers" as much as Allstate's algorithm(s) projected Allstate can get away with without losing them as customers.

67.     Plaintiffs in this case are not challenging any of the virtually infinite number of Allstate Texas filed rates or rating factors as being unreasonable or excessive, but rather are challenging Allstate's internal discriminatory conduct as alleged herein.

68.     As alleged below, Plaintiffs Sara Shannon and Rosa Palacios are among the many Allstate F&C policyholders who have been harmed by Allstate's price tolerance scheme.

### D.    **Allstate's Unfair Discriminatory Conduct is Carried Out in the Dark By Allstate Itself.**

69.     Both of Allstate's unfair discriminatory practices alleged herein were carried out by Allstate itself, as a matter of internal company policy and practice.

70.     Allstate's "open/closed" scheme—and its walling off, pursuant to that scheme, of Closed Book customers in the Closed Books—is done purely as a matter of internal Allstate company policy.  Allstate deliberately does not disclose to the Texas Department of Insurance ("TDI"), or to anyone else outside of Allstate, its conduct in this regard, including, but not limited to, the fact that the "open" books are not in fact open to existing Closed Book customers, or that Allstate takes multiple steps to keep Closed Book customers walled off in the Closed Books and to preclude them from accessing the Open Books.

71.     In fact, Allstate has affirmatively misled the TDI by presenting the Open Books as "open." Moreover, while Allstate has told the TDI that Closed Book customers are eligible for Open Book policies, Allstate has not told the TDI about Allstate's internal restrictions or its other conduct, alleged herein, directed at walling off Closed Book policyholders in the Closed Books and precluding them from accessing the Open Books.

72.     Moreover, as alleged in further detail above, Allstate has taken numerous steps to ensure that Allstate Texas Closed Book policyholders do not themselves learn about the Open Books, that they are eligible for materially the same coverages at lower rates in the Open Books,

or otherwise about what Allstate is doing in discriminating against them vis-à-vis new customers in the Open Books.  As one Allstate agent indirectly admitted, Allstate agents, as a matter of course, are not "transparent" with the Closed Book customers because of the threats and pressures placed on them by Allstate.

73.     With respect to Allstate's <u>price tolerance scheme</u>, Allstate's use of approximately ***922 million*** different microsegments in Texas all but ensures that each Allstate F&C Texas policyholder will be assigned by Allstate into their own individual microsegment, creating a near infinite number of premium rates that can theoretically be charged to any policyholder.  Because the assignment of policyholders to the microsegments (with their accompanying CGRs) is done entirely by Allstate itself, at its discretion based on its secret algorithm(s), Allstate essentially has *carte blanche* to pick the rate that it will charge each policyholder, from among the immense number of potential rates that have been filed.  In other words, Allstate has attempted (successfully in Texas up until this point) to give itself essentially complete discretion to charge Allstate F&C Texas policyholders virtually any rate Allstate chooses (without disclosure), as informed by Allstate's internal projection of how much premium each policyholder will tolerate.

74.     Moreover, because the algorithm(s) used are secret, Allstate's unilateral assignments are carried out entirely in the dark, beyond the view of the policyholders, the public, and even the regulator.  Allstate's secret algorithm(s), the basis for Allstate's microsegment assignments and price tolerance discrimination, are nowhere to be found in Allstate's rate filings with TDI, nor are any of the data that Allstate uses in applying the algorithm(s).

75.     Clearly, no Allstate F&C Texas policyholder or other member of the public could discern from available information what their microsegment is or would be, what their CGR rating factor is or would be, the reasons why Allstate placed them in such a microsegment/CGR, or the

data (or even the nature of the data) used by Allstate for such determination.  Allstate makes its microsegment assignments, which in turn can dramatically impact which of the numerous possible rates will apply to each policyholder, unilaterally with no transparency.

76.     With respect to the regulator, from the beginning, Allstate has gone to great lengths to hide its assignment process and price tolerance discrimination from the TDI.  The only reference in Allstate's Texas rate filings remotely describing the microsegments is a vague and misleading reference that its insurance rating considers "policyholder disruption" and other "marketplace considerations."

77.     Allstate has also instructed its agents to lie about the reasons Allstate F&C Texas policyholders are seeing premium increases, since the start of implementation of the price tolerance practice described herein, rather than acknowledge Allstate's non-risk based microsegmenting and price tolerance discrimination practice.  As described by one Allstate agent, in an anonymous article published by NAPAA (the union of Allstate agents), Allstate warned agents not to explain CGR or microsegmenting to customers and to instead "blame premium increases on inflation."

### E.     Allstate is Aware That Its Conduct Is Unfairly Discriminatory in Violation of Texas Law.

78.     At all relevant times, Allstate knew that its conduct alleged herein is discriminatory and violates Texas's anti-discrimination statute, Texas Insurance Code § 544.052.

79.     It is a commonly accepted actuarial principle that existing business is less risky than new business. Allstate is aware of this actuarial principle and, upon investigation and belief, has itself conducted studies that confirm this commonly accepted actuarial principle.

80.     Allstate knows and has known that its "open/closed" scheme, and walling off its existing Closed Book customers in the Closed Books where they pay higher premiums than newer

customers in the Open Books for the same or materially the same coverages, is unfairly discriminatory in violation of Tex. Ins. Code Section 544.052. Indeed, upon information and belief, Allstate set up an "exit strategy" contingency plan in case this discrimination was discovered, and also contemplated and/or tried out ways that it might structure this scheme to fabricate bogus defenses in the event it was sued for this conduct.

81.     Allstate is also aware that its competitor, Farmers Insurance, was sued in January 2017, under Tex. Ins. Code § 544.050 *et seq*., for its version of an open/closed discrimination scheme, and that the Court in the Farmers case issued an opinion, dated January 19, 2018, finding that "an internal policy of precluding policyholders [from] the same or materially the same coverages … would violate section 544.052."

82.     With respect to Allstate's price tolerance scheme, beyond Texas, Allstate has attempted to implement the same or similar discriminatory practice, described herein, in several of the other states where Allstate offers auto insurance.  In those states where regulators have been able to get a closer look at what Allstate is actually doing/proposing to do (e.g., where the regulatory regime in the state requires "prior approval" of rating plans before they are utilized in the state), Allstate's practice has repeatedly been rejected as blatantly discriminatory.  For example, in 2014, Florida rejected Allstate's plan to set individuals' premium based on his or her "modeled reaction to rate changes," determining it was "unfairly discriminatory."  Likewise, Maryland rejected Allstate's proposal to implement this practice, resulting in Allstate withdrawing the proposal and the Maryland regulator issuing a bulletin declaring that "price optimization" practices such as that proposed by Allstate "results in rates that are unfairly discriminatory in violation of the §27-212(e)(1) of the Insurance Article," Maryland's anti-discrimination statute. Likewise, Georgia disapproved a proposal by Allstate to implement this practice, stating that it

"does not allow the use of price optimization."  Allstate withdrew similar proposals in multiple other states (including Louisiana and Rhode Island) after regulators asked pointed questions about the practice.

83.     Numerous states have also explicitly confirmed that "price optimization" practices more generally (of which Allstate's practice alleged herein is an iteration or is at least largely analogous) are discriminatory, illegal under similar anti-discrimination statutes, and banned. Those states include Ohio, California, Florida, Vermont, Washington, Indiana, Pennsylvania, Maine, Rhode Island, Montana, Delaware, Colorado, Minnesota, Connecticut, Alaska, Missouri, Virginia, and the District of Columbia.

84.     Allstate is well aware of these pronouncements and bans, and of the resounding message associated therewith—insurance rates must be based on risk-related factors, and cannot be based on non-risk-related factors such as how much an insurer can manage to squeeze out of each policyholder.  Texas law is in harmony, expressly prohibiting, in no uncertain terms, conduct that results in charging different rates or premiums to policyholders of the same risk level, without a sound actuarial basis.  Texas Ins. Code §§ 544.052, 544.053.

85.     Erasing any doubt whatsoever that Allstate *knew* it was violating Texas's anti-discrimination law by its microsegmenting/price tolerance scheme alleged herein, Allstate was confronted about its violation at least as early as 2015, by the Texas Office of Public Insurance Counsel ("OPIC"), an independent Texas state agency created in 1991 with a mission of "represent[ing] consumers in insurance matters."[4]

86.     OPIC subpoenaed certain confidential (non-public) information from Allstate about the microsegmenting practices alleged herein.  These records are not found in any public filings.

---

[4] https://www.opic.texas.gov/what-we-do/.

After analyzing this confidential information, OPIC sent a letter in October 2015 which Allstate received (not available through the public SERFF database) stating that the confidential information OPIC reviewed showed that:

> [R]etention models were [being] used [by Allstate] to assess policyholders' likelihood of changing carriers due to a rate change. Individual policyholders were then assigned to CGR microsegments that reflected … that likelihood. The CGR microsegment assignment then affected the level of rate increase or decrease a policyholder. received as a result of the overall rate filing. For example, those more likely to accept a rate increase received proportionally larger increases while those more inclined to select another company received smaller increases.

87.     OPIC's letter forcefully called out Allstate's intentional unfair discrimination. OPIC stated that "CGR-based rates both ignore actuarial indications and create class distinctions that are neither risk nor cost-based. Essentially, rating distinctions are based on a policyholder's sensitivity to price change."   OPIC further commented that Allstate's practice and secret algorithm(s) were designed as a "mechanism for cross-subsidies among risks … it is clear that some policyholders shoulder a higher rate so another can gain a lower rate." OPIC further explained that Allstate's conduct constitutes intentional violations of Section 544.052:

> An insurer violates §544.052 by making or permitting unfair discrimination between individuals. of the same class and essentially the same hazard in the amount of premiums or rates charged for insurance unless it is based on sound actuarial principles. The current Allstate method meets this definition of "unfair discrimination" because Allstate is <u>knowingly</u> treating individuals with essentially the same risk hazards differently because they are adjusting the rate based on price elasticity, and other non-risk factors, after they develop the actuarially sound rate.

(emphasis added.)

88.     On information and belief, this letter was sent to and received by Allstate.

**F.**      **Plaintiffs and Class Members Incurred Economic Damages Due to Allstate's Unfair Discrimination**

89.      As a result of Allstate's multiple unfair discriminatory schemes in violation of Texas Insurance Code § 544.052, alleged herein, Plaintiffs and each member of the proposed Classes incurred actual out of pocket economic damages.

90.      As a result of FGI's discriminatory "open/closed" practice alleged herein, Plaintiff Corbello and at least hundreds of thousands of other Allstate Texas Closed Book policyholders sustained economic damages, including paying higher premiums than otherwise identically-situated new customers paid in the Open Books for the same or materially the same coverages.

91.      As a result of FGI's discriminatory "price tolerance" practice alleged herein, Plaintiffs Shannon and Palacios and at least hundreds of thousands of other Allstate F&C Texas policyholders were assigned by Allstate to a microsegment with a corresponding positive CGR factor—as a result of Allstate's internal application of its secret algorithm(s) and projection thereby regarding their relative sensitivity to premium price changes.  They are on Allstate's "suckers list" (a term borrowed from the Consumer Reports assessment of Allstate's behavior) and have been and are unwittingly being charged higher premiums for the same policies and coverages than other Allstate F&C Texas customers who are otherwise identically situated (including from a risk perspective).

92.      Plaintiffs and each member of the proposed Classes paid more to Allstate than they would have paid but for Allstate's discriminatory conduct alleged herein.

93.      Plaintiffs and the proposed Classes are entitled to recover economic damages and obtain injunctive relief for Allstate's unfair discrimination in violation of § 544.054 Texas Insurance Code.

94.     Further, because Allstate's violations of § 544.052 were knowing, the Court should impose statutory civil penalties under Texas Insurance Code § 544.054.

95.     Each day there are several thousand Allstate Texas personal auto policies up for renewal. Thus, every day that Allstate's misconduct alleged herein continues unabated, thousands of existing Allstate Texas policyholders are victimized and re-victimized.  To end the unfair discrimination and to mitigate the economic damages to each class member, prompt injunctive relief is necessary and appropriate under these circumstances.

**G.     Fraudulent Concealment, Tolling, and Discovery Rule**

96.     Allstate does not disclose its unfairly discriminatory practices alleged herein, and in fact actively conceals them.

97.     Upon information and belief, and the investigation of counsel, and as alleged in further detail above, Allstate has instructed and threatened Allstate Texas agents not to disclose to existing Closed Book policyholders the Open Books or that they are eligible for policies with the same or materially the same coverages at lower premiums in the Open Books.  Nor does Allstate disclose in its public filings, or anywhere else that any Close Book customer or member of the public could see or reasonably see, that it engages in this scheme or that it otherwise engages in non-risk based differential treatment of its Texas policyholders in violation of Tex. Ins. Code § 544.052. Allstate's public filings misrepresent that the Open Books are "open" to Closed Book customers, when in fact Allstate imposes internal restrictions and takes numerous steps to wall off and preclude Closed Book customers from the Open Books.

98.     Nor does Allstate disclose in its public filings, or anywhere else that any Price Tolerance Class member or member of the public could see or reasonably see, that it engages in the price tolerance scheme or that it otherwise engages in non-risk based differential treatment of its Texas policyholders in violation of Tex. Ins. Code § 544.052. Allstate, in fact, went to great

lengths *not* to disclose (i.e., to conceal) that information, its microsegment assignment process, and the secret algorithm(s) and underlying data that Allstate utilizes for this scheme.

99.     No class member or member of the public, including Plaintiffs themselves, could in the exercise of reasonable diligence know that Allstate has engaged in the alleged unfairly discriminatory conduct.

100.     No reasonably diligent Closed Book policyholder (including Plaintiff Corbello)) would map together Allstate's "company" shell game, understand they are being walled off in a Closed Book in furtherance of an "open/closed" scheme, or understand that they are being subjected to discrimination vis-à-vis new customers in Open Books. And indeed, the primary resource for Allstate policyholder questions (the Allstate agents), were being instructed and threatened into not disclosing such facts.

101.     Nor could any reasonably diligent Allstate F&C Texas policyholder (including Plaintiffs Shannon and Palacios) or potential policyholder determine what microsegment they have been or would be placed in, how that determination was or would be made, or the consequences.

102.     Additionally, Allstate does not publicly state anywhere, and in fact affirmatively conceals, that its conduct alleged herein has the intended and expected effect of causing more tenured Allstate Texas policyholders to generally pay higher premiums, for the same coverages, than new or less tenured policyholders.

103.     In fact, one agent wrote anonymously that at certain meetings, Allstate employees instructed agents not to explain Allstate's microsegmenting/price tolerance practice to policyholders and to instead "blame premium increases on inflation" (*i.e.*, lie to policyholders).

104.     Allstate's disclosure of information is so scant that there is no way – based on publicly available information – for Plaintiffs or class members to determine if they have been

economically harmed by Allstate's conduct. Accordingly, Plaintiffs' and class members' claims, even if not equitably tolled, have yet to accrue.

## V.   PLAINTIFFS' INDIVIDUAL FACTS

### A.   Plaintiff Sara Shannon

105.   Plaintiff Sara Shannon has been an Allstate Texas auto policyholder since approximately 2002. Most recently, her policy has been underwritten by Allstate F&C.

106.   Plaintiff Shannon is a member of the proposed Price Tolerance Class (defined below).

107.   Plaintiff Shannon was injured by Allstate's unfair discrimination against her.  On information and belief, in one or more years since 2014 and including at least once in the last two years, Allstate unilaterally assigned Plaintiff Shannon to a microsegment with a positive CGR factor, based on Allstate's internal projection of her elasticity to premium price changes.  As a result, Plaintiff Shannon was charged higher premiums than otherwise-identically situated (including from a risk perspective) Allstate F&C Texas policyholders for the same policy and coverages.

108.   In one or more years since 2014 including at least once in the last two years, Plaintiff Shannon was charged more by Allstate than she would have been charged but for Allstate's discriminatory conduct.

109.   At all relevant times, Allstate concealed from Plaintiff Shannon its unfairly discriminatory conduct alleged herein.  Plaintiff Shannon did not know about, and in the exercise of reasonable diligence, could not have discovered for herself Allstate's conduct.

110.   As a result of Allstate's misconduct alleged herein, Plaintiff Shannon suffered economic harm since June 26, 2014.

B.    **Plaintiff Rosa Palacios**

111.    Plaintiff Rosa Palacios has been an Allstate Texas auto policyholder since approximately 2014. Most recently, her policy has been underwritten by Allstate F&C.

112.    Plaintiff Palacios is a member of the proposed Price Tolerance Class (defined below).

113.    Plaintiff Palacios was injured by Allstate's unfair discrimination against her.  On information and belief, in one or more years since 2014 and including at least once in the last two years, Allstate unilaterally assigned Plaintiff Palacios to a microsegment with a positive CGR factor, based on Allstate's internal projection of her elasticity to premium price changes.  As a result, Plaintiff Palacios was charged higher premiums than otherwise-identically situated (including from a risk perspective) Allstate F&C Texas policyholders for the same policy and coverages.

114.    In one or more years since 2014 and at least once in the last two years, Plaintiff Palacios was charged more by Allstate than she would have been charged but for Allstate's discriminatory conduct.

115.    At all relevant times, Allstate concealed from Plaintiff Palacios its unfairly discriminatory conduct alleged herein.  Plaintiff Palacios did not know about, and in the exercise of reasonable diligence, could not have discovered for herself Allstate's conduct.

116.    As a result of Allstate's misconduct alleged herein, Plaintiff Palacios suffered economic harm since June 26, 2014.

C.    **Plaintiff Debra Corbello**

117.    Plaintiff Debra Corbello was an Allstate Texas auto policyholder until approximately March 15, 2020.  Until she left Allstate, Ms. Corbello had been an Allstate

policyholder since approximately 2000. Most recently, Plaintiff Corbello's policy was underwritten by Allstate Indemnity Company.

118.    Plaintiff Corbello is a member of the Open/Closed Class (defined below).

119.    Plaintiff Corbello was injured by Allstate's unfair discrimination against her.  Until she left Allstate on approximately March 15, 2020, Plaintiff Corbello was in one of the Allstate Texas Closed Books, Allstate Indemnity Company.  On information and belief, in one or more years since 2008 including at least once in the last two years, Plaintiff Corbello was eligible for the same or materially the same coverages for lower premiums in either or both of the Allstate Texas Open Books, Allstate F&C and Allstate County Mutual, than she was paying in the Allstate Indemnity Company book. Plaintiff Corbello was charged higher premiums than otherwise identically- situated (including from a risk perspective) new Allstate Texas Open Book policyholders for the same or materially the same coverages.

120.    On March 5, 2020, Ms. Corbello received a renewal offer for renewing her Allstate Indemnity Company policy (Closed Book).  That renewal offer was for $618.50 for a six-month policy renewal date starting April 21, 2020.

121.    Rather than renew her policy, Ms. Corbello decided to switch auto insurers. However, on or about March 26, 2020 (just three weeks after she recived the March 5, 2020 Allstate Indemnity Company renewal quote, and without any material change in Ms. Corbello's underwriting characteristics), Ms. Corbello received a quote from her Allstate agent to be underwritten as a new customer in Allstate F&C (Open Book).  The name of the issuing "company" was not specified directly on the quote.  The quote was for $499.68, or approximately 20% less than what she was quoted for the same policy period under for a renewed Allstate Indemnity Company policy.

122.    The March 26, 2020 Allstate F&C quote for Ms. Corbello was for the same or materially the same coverages as she had under her Allstate Indemnity Company policy.  In fact, if anything, the coverages were *better* under Allstate F&C—The would-be Allsate F&C policy provided significantly *higher* coverage limits and *lower* deductibles, and was otherwise materially the same.

123.    Despite being eligible for a materially similar and cheaper Allstate F&C policy for years, Ms. Corbello never learned this information or that she was walled off in a Closed Book, Allstate Indemnity Company, paying higher premiums than otherwise identically- situated newer Allstate Texas customers were paying in the Open Books.  Ms. Corbello was never advised of this by her Allstate Texas agent(s), presumably because of Allstate's intimidation and manipulation efforts described above.

124.    In one or more years since 2008 and at least once in the last two years, Plaintiff Corbello was charged more by Allstate than she would have been charged but for Allstate's discriminatory conduct.

125.    At all relevant times, Allstate concealed from Plaintiff Corbello its unfairly discriminatory conduct alleged herein.  Plaintiff Corbello did not know about, and in the exercise of reasonable diligence, could not have discovered for herself Allstate's conduct.

126.    As a result of Defendant's misconduct alleged herein, Plaintiff Corbello suffered economic harm since January 1, 2008 up until the day her policy expired with Allstate.

## VI.    CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this action both individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) against Allstate on their own behalf and on behalf of the following "Classes":

The "Open/Closed Class":  All Allstate Texas personal auto policyholders who, from January 1, 2008 to the present, had an active policy underwritten by Allstate Indemnity Company or Allstate County Mutual Insurance Company-Classic.

The "Price Tolerance Class":  All Allstate F&C Texas personal auto policyholders who, for any policy period from June 26, 2014 to present, were assigned by Allstate into a microsegment with a corresponding positive CGR factor.

128.    Excluded from the Classes are: (a) any Judge or Magistrate presiding over this action, and members of their families; (b) Allstate and affiliated entities, their employees, officers, directors, and licensed agents; (c) Allstate's legal representatives, assigns and successors; and (d) all persons who properly execute and file a timely request for exclusion from any Court-approved class.

129.    Plaintiffs reserve the right to modify the foregoing class definitions, or to create subclasses as the Court deems necessary.

130.    Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Classes.

131.    **Numerosity**: While the exact number of class members cannot be determined without discovery, each of the Classes is believed to consist of at least hundreds of thousands of Allstate Texas auto policyholders.  The exact number of class members can readily be determined upon review of policy information and other records maintained by Allstate.  The class members are therefore so numerous that joinder of all members is impracticable.

132.    **Commonality**:  Common questions of law and fact exist as to the class members, including but not limited to:

        a.      Whether Allstate is a "person" within the meaning of Section 544.052 of the Texas Insurance Code;

b.      Whether Allstate, through its conduct alleged herein, has engaged in unfair discrimination between individuals of the same class and of essentially the same hazard in the amounts of premiums, policy fees, or rates;

c.      Whether Allstate, through its conduct alleged herein, has permitted the unfair discrimination between individuals of the same class and of essentially the same hazard in the amounts of premiums, policy fees, or rates;

d.      Whether Allstate's conduct alleged herein was based on "sound actuarial principles";

e.      Whether Plaintiffs and class members are entitled to damages and/or restitution;

f.      Whether Plaintiffs and class members are entitled to equitable relief against Allstate, including an injunction stopping Allstate's alleged misconduct; and

g.      Whether Allstate's conduct alleged herein was committed knowingly.

133.   **Typicality**:  Plaintiffs' claims are typical of class members' claims.  Plaintiffs Shannon and Palacios and the other Price Tolerance Class members were all subject to Allstate's price tolerance scheme alleged herein.  Plaintiff Corbello and the other Open/Closed Class members were all subject to Allstate's open/closed scheme alleged herein.  Plaintiffs have substantially the same interest in this matter as all other members of the respective class they are part of, and their claims arise out of the same set of facts and conduct as those of the other class members.

134.   **Adequacy of Representation**:  Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in insurance, insurance discrimination, class action, and federal court litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately

protect the interests of class members. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other class members they seek to represent. Plaintiffs have no disabling conflicts with class members and will fairly and adequately represent the interests of class members.

135.    The elements of Rule 23(b)(2) are met. Absent injunctive relief, Allstate will continue to commit the violations alleged. Allstate has acted on grounds that apply generally to class members so that preliminary and/or final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

136.    The elements of Rule 23(b)(3) are met. Common questions of law and fact will predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is furthermore not efficient, timely or proper. Timing concerns are especially appropriate where, as here, thousands of class members are being victimized on a daily basis by Allstate's illegal conduct. Judicial resources would be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of thousands of claimants in one suit would be impractical or impossible. In addition, individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. Plaintiffs' counsel, highly experienced in insurance, class action, and federal court litigation, foresee little difficulty in the management of this case as a class action.

## **FIRST CAUSE OF ACTION**

### **VIOLATION OF TEXAS INSURANCE CODE § 544.052**
### **(Individually and on Behalf of the Open/Closed Class)**

137.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

138.    Plaintiff Corbello brings this cause of action on behalf of herself and the other members of Open/Closed Class.

139.    Section 544.052 of the Texas Insurance Code states that "[a] person may not in any manner engage in unfair discrimination or permit unfair discrimination between individuals of the same class and of essentially the same hazard, including unfair discrimination in … the amount of premium, policy fees, or rates charged for a policy or contract of insurance."

140.    Section 544.054 of the Texas Insurance Code states that "[a] person who has sustained economic damages as the result of a violation of Section 544.052 may maintain only in a Travis County district court an action against the person who violated that section."

141.    Allstate is a "person" within the meaning of the statute.

142.    Plaintiffs Corbello and the other Open/Closed Class members are "of the same class and essentially of the same hazard" as otherwise identical Allstate Texas policyholders who received Open Book policies.  More generally, existing Allstate Texas Closed Book auto insurance customers are "of the same class and essentially of the same hazard" as otherwise identical new Allstate Texas policyholders.  There is no legitimate actuarial justification or basis for charging existing Closed Book auto insurance customers higher premiums than an otherwise identical new Allstate Texas auto insurance customer.

143.    Through Allstate's actions alleged herein, Allstate has engaged in, directed, supervised, managed, and permitted, unfair discrimination with respect to premium, policy fees, or rates charged between individuals of the same class and of essentially the same hazard.

144.    Allstate's discriminatory conduct and differential treatment alleged herein was not based on sound actuarial principles.  Texas Insurance Code § 544.053.

145.    Allstate is liable to Plaintiff Corbello and the Open/Closed Class members for the economic damages they incurred as a result of Allstate's violations of Texas Insurance Code § 544.052.

146.    Allstate is also liable for statutory civil penalties pursuant to Texas Insurance Code § 544.054, which provides that "[i]f the trier of fact finds that that the defendant knowingly committed an act prohibited by Section 544.052, the court may award a civil penalty in an amount of not more than $25,000 for each claimant."

147.    Allstate's illegal conduct alleged herein was committed knowingly and deliberately.

148.    Allstate was specifically aware that its conduct violated Texas Insurance Code § 544.052.  It recognized that its conduct was unfairly discriminatory in violation of the statute, was aware of the Court's ruling in the *Grigson v. Farmers* case, and Allstate has sophisticated counsel who are certainly well-versed in insurance unfair discrimination laws in Texas and elsewhere.

149.    Allstate is also liable for costs, attorneys' fees, expert witness fees, as explicitly provided for by Section 544.054 of the Texas Insurance Code, as well as any other relief allowable in law or equity.

150.    Finally, the Court should award preliminary and/or final injunctive relief against the illegal practices alleged herein, which are ongoing. Such relief is expressly permitted pursuant to applicable federal and state law, including but not limited to, Federal Rule of Civil Procedure 65 and Texas Insurance Code Section 544.052(c)(2).

## SECOND CAUSE OF ACTION

**VIOLATION OF TEXAS INSURANCE CODE § 544.052**
**(Individually and on Behalf of the Price Tolerance Class)**

151.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

152.    Plaintiffs Shannon and Palacios bring this cause of action on behalf of themselves and the other members of the Price Tolerance Class.

153.    Section 544.052 of the Texas Insurance Code states that "[a] person may not in any manner engage in unfair discrimination or permit unfair discrimination between individuals of the same class and of essentially the same hazard, including unfair discrimination in … the amount of premium, policy fees, or rates charged for a policy or contract of insurance."

154.    Section 544.054 of the Texas Insurance Code states that "[a] person who has sustained economic damages as the result of a violation of Section 544.052 may maintain only in a Travis County district court an action against the person who violated that section."

155.    Allstate is a "person" within the meaning of the statute.

156.    Plaintiffs Shannon and Palacios and the other Price Tolerance Class members are "of the same class and essentially of the same hazard" as otherwise identical Allstate F&C Texas policyholders who were assigned by Allstate to a microsegment with a lower, neutral, or negative CGR factor.  There is no actuarial justification or basis for charging Plaintiffs Shannon and Palacios and the Price Tolerance Class members higher premiums than otherwise identical Allstate F&C Texas policyholders who were assigned by Allstate to a microsegment with a lower, neutral, or negative CGR factor, or for charging more tenured policyholders higher premiums than otherwise identical less tenured or new policyholders. Similarly, there is no legitimate actuarial justification for charging Allstate F&C Texas auto insurance customers different premiums based

on their respective or perceived/projected respective inelasticity, tolerance, or sensitivity to price, or their relative or perceived relative willingness to pay.

157.     Through Allstate's actions alleged herein, Allstate has engaged in, directed, supervised, managed, and permitted, unfair discrimination with respect to premium, policy fees, or rates charged between individuals of the same class and of essentially the same hazard.

158.     Allstate's discriminatory conduct and differential treatment alleged herein was not based on sound actuarial principles.  Texas Insurance Code § 544.053.

159.     Allstate is liable to Plaintiffs Shannon and Palacios and the Price Tolerance Class members for the economic damages they incurred as a result of Allstate's violations of Texas Insurance Code § 544.052.

160.     Allstate is also liable for statutory civil penalties pursuant to Texas Insurance Code § 544.054, which provides that "[i]f the trier of fact finds that that the defendant knowingly committed an act prohibited by Section 544.052, the court may award a civil penalty in an amount of not more than $25,000 for each claimant."

161.     Allstate's illegal conduct alleged herein was committed knowingly and deliberately.

162.     Allstate was specifically aware that its conduct violated Texas Insurance Code § 544.052.  It was specifically told same by OPIC, and Allstate has sophisticated counsel who are certainly well-versed in insurance unfair discrimination laws in Texas and elsewhere.

163.     Allstate is also liable for costs, attorneys' fees, expert witness fees, as explicitly provided for by Section 544.054 of the Texas Insurance Code, as well as any other relief allowable in law or equity.

164.    Finally, the Court should award preliminary and/or final injunctive relief against the illegal practices alleged herein, which are ongoing. Such relief is expressly permitted pursuant to applicable federal and state law, including but not limited to, Federal Rule of Civil Procedure 65 and Texas Insurance Code Section 544.052(c)(2).

## JURY DEMAND

Plaintiffs respectfully request a trial by jury on all causes of action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following judgment:

A.    An Order certifying this Action as a class action, and certifying the Price Tolerance Class and Open/Closed Class;

B.    An Order appointing Plaintiffs Shannon and Palacios as class representatives for the Price Tolerance Class, appointing Plaintiff Corbello as class representative for the Open/Closed Class, and appointing the undersigned counsel as Class Counsel to represent the Classes;

C.    A Declaration that Allstate's conduct described herein constitutes unfair discrimination in violation of the Texas Insurance Code § 544.052;

D.    An Order awarding appropriate preliminary and/or final injunctive relief against the conduct of Allstate described herein;

E.    Payment to Plaintiffs, the Price Tolerance Class members, and the Open/Closed Class members of all damages and/or restitution in an amount to be proven at trial;

F.    An award of attorneys' fees, class representative incentive fees, expert witness fees, and costs, as provided by Texas Insurance Code § 544.054(c) and as would be reasonable from any recovery of monies recovered for or benefits bestowed on the class members;

G.    An award of statutory penalties, up to the maximum of $25,000 per class member, for Allstate's knowing violations.  Texas Insurance Code § 544.054(e);

H.      Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

I.      Such other and further relief as this Court may deem just, equitable, or proper.


Dated: April 28, 2020.                         RESPECTFULLY SUBMITTED,

                                               _____/s/ John R. Davis_____
                                               John R. Davis (TX Bar 24099518)
                                               Michael L. Slack (TX Bar 18476800)
                                               SLACK DAVIS SANGER, LLP
                                               6001 Bold Ruler Way, Suite 100
                                               Austin, TX 78746
                                               Tel.: 512-795-8686
                                               Fax: 512-795-8787
                                               jdavis@slackdavis.com
                                               mslack@slackdavis.com

                                               Joe K. Longley (TX Bar No. 00000114)
                                               LAW OFFICES OF JOE K. LONGLEY
                                               3305 Northland Dr. Suite 500
                                               Austin, Texas 78731
                                               Tel.: 512-477-4444
                                               Fax: 512-477-4470
                                               joe@joelongley.com

                                               Roger N. Heller (CA Bar 215348) (*pro hac vice*
                                               anticipated)
                                               LIEFF CABRASER HEIMANN & BERNSTEIN,
                                               LLP
                                               275 Battery Street, 29th Floor
                                               San Francisco, CA 94111
                                               Tel.: 415-956-1000
                                               Fax: 415-956-1008
                                               rheller@lchb.com

                                               Jonathan D. Selbin (NY Bar 3948684 (*pro hac vice*
                                               anticipated)
                                               LIEFF CABRASER HEIMANN & BERNSTEIN,
                                               LLP
                                               250 Hudson Street, 8th Floor
                                               New York, NY 10013
                                               Tel.: 212-355-9500
                                               Fax: 212-355-9592

jselbin@lchb.com